Good morning. May it please the court. I'm Alexander Morales. I'm the representative of the petition in this case. The main issue in this case is whether substantial evidence supports the immigration judge's adverse credibility determination in the case. According to the judge, the primary reason why he found the petitioner not credible was because of inconsistent testimony regarding the number of days that she was detained. The judge found that, according to the judge, the petitioner and her son, who was a witness in the case, had testified inconsistently regarding the number of days. However, a review of the record reveals that their testimony was substantially consistent with each other and within their own testimony and also within with the application. If the adverse credibility determination is reversed, then respondent, I'm sorry, petitioner can be considered. The other basis for denying the case are not there because if she's found credible, the lack of corroboration is overcome and she can be considered eligible for asylum. And the other discrepancies identified by the judge are not there. If you look at the record, when the petitioner testified regarding the number of days, she testified that she was detained for three days and hospitalized for 17 days for a total of 20 days. That's at the administrative record, page 74. When the petitioner's son testified, he also testified that she was initially detained for three to four days, and when asked to clarify, he stated that she was detained for a total of 17. And then he started counting 17, 18, 20 days. So their testimony is consistent. And if that is so, if the credibility determination is reversed, then ---- And he wasn't present during her testimony, and he comes in and asks how long his mother was detained. He says three days. Then under prompting, he says, well, maybe my recollection wasn't right. Maybe it was like 17. I mean, there's some degree of difference between three and 17 days. And he was intimately involved in it. She testified both that her documents had been seized at the airport and that they hadn't been seized at the airport. She said that, you know, a passport was taken and that it wasn't taken. She said that, you know, she had jewelry which was supposed to be declared, and that's why she was seized. And then she said, well, no, it was because she had documents that they stopped her for and seized her to get. But then she said, but I ---- the documents were in a briefcase, and I dropped the briefcase and kicked it away, and my compatriots picked it up. So there's inconsistency all over the place. Yes, Your Honor. I'll address the first issue regarding the son's testimony. According to the son, when he was first asked, he did say three to four days. On redirect, when he was asked by Petitioner's Counsel, she asked him whether she had been hospitalized also. And that's when he clarified that she had been hospitalized for about 17 days. So in sum, the total number of days that she was detained, and also when the son testified, he ---- He was in the hospital for 17 days. She didn't say she was. She indicated she had been hospitalized. I apologize, Your Honor. It indicated it was hospitalized for three days and that she was detained for 17 days. And in terms of the Petitioner's testimony, with regards to that, he explained that the hospital was in the same facility as the jail that was part of the KGB headquarters. So with regards to that, he did mention that it was in the same ---- essentially in the same facility. With regards to the testimony as to the passport, there was testimony regarding briefcases. She testified that when she arrived at the airport, she was met by members of her party who had a briefcase that they wanted her to carry to the United States. The record is not clear as to whether or not she had her own personal briefcase with her, in which she might have had the jewelry or other personal items that they confiscated from her. She did testify that the briefcase that the party members had tried to give to her, she sat down and she picked away so that they didn't catch her with that document. But she did testify that she was accused of taking contraband, which was the jewelry. So presumably it can be inferred that she did have something that she was carrying personal items in. Well, there's certainly nothing, no persecution connected with being seized because you're carrying contraband. Not in that specific item. That was the one incident of detention. But she had testified regarding other events in the past when she had been harassed at her workplace. She was a professor at the university. She testified that she was consistently harassed and asked to turn over documents. She was embarrassed, offended in front of her students. She never gave any specific incident of it. She just said she was arrested, right? Well, the arrest was a specific one that she talked about at the airport. I understand that. So that was the one incident. And she testified that she was detained and she was held for a number of days. So in that regard, if you look at that and also look at all the other events, the burning of the Spirk printing shop, which she used to work at, the constant telephone. That was connected with her. Is there? She used to be the proofreader for the print shop. As I understand, is there anything to show that the print shop where she was a proofreader was burned because of her? She was actively involved with the party. Well, I know she was proofreading. And she testified she had been active in the party for a long period of time and that they kept asking her to turn over documents that the party possessed. So in that way, she was being persecuted for political opinion because she was actively identified with that party. If there are no further questions, I'll reserve my time. Okay. Thank you. Thank you, Your Honors. May it please the Court. I am Blair O'Connor, appearing on behalf of the Attorney General. Your Honors, this is a case about a proofreader whose own story was so. More than a proofreader, she also edited. She taught at a university level. She wasn't just a low-level functionary. I mean, that seems to be the implication by saying she was only a proofreader. Yes, Your Honor. She was a proofreader and editor, but her own story was so fraught with inconsistencies, discrepancies and errors that it simply was not credible. Well, that's a generalization. Be specific. Yes, Your Honor. The seminal event of her asylum. Tell me, counsel, what's her age? I believe today, Your Honor, it's upper 70s. How about 80? 80, okay. Yes, Your Honor. She's 79 or 80, isn't she? I think she's 79. Her birth date is December 9th, 1926. So I guess she'll be 78 after. I've disparaged people in their 70s or late 70s. By all means, Your Honor. That does seem to be a factor, doesn't it? Your Honor, the government says it's not a factor with respect to whether or not she satisfied her eligibility for asylum. There's no, I mean, the definition of refugee does not take into account someone's age. I'm kind of puzzled here. Maybe you could just tell me. You have a near 80-year-old woman. She was, I don't know if this was, she was late 70s when this was all, when this proceeding was going on. And she has two grown sons who are legally in the United States. Isn't that correct? With our grand asylum, we don't know what their current status is, Your Honor. I got it. Okay. Does the government take that into account that you have an elderly woman like that who, you can talk about the inconsistencies, but there's certainly a lot of consistent testimony that in two of her occupations, she was harassed by the government. Does that factor into the analysis at all of whether this is somebody that the government wants to? I'm sure it would, Your Honor. I mean, that evidence was before the immigration judge. He was aware of her age, and he did allow in the documents which showed that both of his sons had been granted asylum by the agency. And so that evidence was definitely before the immigration judge, and it would have been considered by him in adjudicating her case. Now, the seminal event of her claim was the alleged arrest and detention by KGB members at the Yerevan airport near the end of 1992. Now, most significantly, Your Honor, this event was in no way mentioned whatsoever, and her asylum application was filed less than a month after she entered the United States. Such a major and significant omission from her application, standing alone, provides a specific and cogent reason for the adverse credibility determination in this case. Now, she attempted to minimize the inconsistencies between her asylum application and her testimony during the asylum merits hearing. Exactly what was in her asylum application? Your Honor, the only thing in her asylum application was that she said that she was a section leader in the Dashnik party. Her family had been well-known members of the Dashnik party, and that if her membership were revealed, if she were to return to Armenia, that therefore she would be incarcerated. There was no mention of specific incidences of persecution that she suffered in Armenia in her initially filed asylum application. It was basically almost primarily based on a fear of persecution solely on account of her being a section leader, as she put it in her asylum application, in the Dashnik party, which again was inconsistent with her testimony before the immigration judge where she said, however, I was a proofreader and editor and taught at the university, philosophy at the university. Now, again, she attempted to minimize inconsistencies by submitting a declaration approximately three and a half years later after she submitted her asylum application in which she claimed that she had no knowledge of the information in her asylum application, and that, in fact, she thought that the individual who prepared it was preparing an employment authorization for her, and that if she had known it was an asylum application, she would have submitted corroborating information. Now, this claim is completely belied by the fact that less than a month before she submitted this declaration, she affirmed in court before the immigration judge that she was familiar with all the information in her asylum application and that it was complete and true and accurate. That was said in court less than a month before submitting the declaration. Furthermore, her claim in her declaration that she didn't even know she was submitting an asylum application and that she had known she would have submitted a supporting documentation, that's contradicted by the fact that her asylum application was supported by supporting documentation, including a letter from the Yerevan National Security Council, which stated that the case against her had been closed, as well as six separate articles that described the treatment of Daeshnik Party members in Armenia during the time that she was there. Now, again, that completely contradicts her claim that, well, I didn't even know I was submitting an asylum application, because she did submit supporting documentation in support of that application. She gave hopelessly conflicting evidence, as has been discussed, regarding the length of detention that she was allegedly detained by the KGB members. In her declaration and on direct examination, she said she was detained for 17 days and hospitalized for three days. On cross-examination, she changed her story and said she was only detained for 10 days and was then placed under home arrest for a period of three months. As has been brought out before, the situation regarding the length of detention was made more unclear by her son, who initially testified that she was only detained for three or four days, but under cross- and redirect-examination by petitioners on counsel, he changed the story and said, well, it could have been anywhere between 17, 18, 20 days. It could have been over a month, in fact. There was also inconsistencies regarding her role in the ARF. Her asylum application said she was a section leader, but in her testimony before the immigration judge, she said she was only a proofreader and editor for the Dashnik Party newspaper. When confronted with this inconsistency, she attempted to explain it by saying, well, the asylum application was in English, therefore I didn't understand what was in it. But that was belied by the fact that she testified before the immigration judge that she was completely familiar with the information in her asylum application and that everything in there, including the fact that she was a section leader, was complete and true. There were also inconsistencies regarding the number of times she was detained. Her asylum application stated that she was regularly arrested and interrogated by KGB members, yet she was very clear in her testimony before the immigration judge that the only time she was arrested was at the Yerevan airport in November of 1992. But she also testified that the KGB folks came into her classroom and interrupted her classes and harassed her, and there were a number of incidents there, and that they came to the Spirk building and harassed them there, too, correct? That's true, Your Honor. But she never said that. So now we're debating whether that's a detention or an arrest, and I didn't find that all that persuasive. Understood, Your Honor. Another significant omission was that during her testimony before the immigration judge, she at no time made any mention of being either beaten or tortured while she was detained by the KGB in November of 1992. Rather, her testimony regarding the details of this detention was limited to saying that she was not allowed to go to the bathroom unaccompanied while she was detained, that she was offended, she was put into a solitary room, and their health worsened. Now, again, this is the seminal event of her claim of persecution, this detention. Her declaration states that she was tortured during this time. It completely is unreasonable that she would omit the details of this detention in her testimony before the immigration judge, another significant omission that provides specific cogent reasons for the adverse credibility determination in this case. I would lastly like to touch upon the fact of her failure to corroborate her claim. Now, when questioned about that by the immigration judge, her explanation was, well, everything that I had that would have corroborated my claim was in the briefcase that I dropped at the airport and was taken by my fellow Dachinic Party members. The reason this is not a reasonable explanation is that she had more than five years from the time she entered the United States in which to try to obtain other copies, other documents that would have corroborated her role in the Dachinic Party and the incidents of persecution. In fact, during one of the master calendar hearings, her attorney specifically requested the immigration judge to allow him additional time in which to submit supporting documentation, quote, to get documents from Armenia as to her political affiliations, which is at the record of page 51. So after being given additional time in which to obtain corroborating documents, she completely failed to do so. There was nothing in the record that would have supported her claims with regards to her political affiliation and her incidents of persecution. Furthermore, the State Department report showed that the Dachinic Party remained active at the time of her asylum hearing and that the party's apparatus continued to operate in many respects. Therefore, again, it would have been reasonable for her to get a hold of some of the fellow members in Armenia and to ask them to submit documents that would have corroborated her claim. Barring any further questions, Your Honors, again, the government would say because the adverse credibility determination in this case is supported by specific cogent reasons and the record fails to compel a conclusion contrary to that reached by the immigration judge, the petition for review should be denied. Thank you, Your Honor. One of the things pointed out was regarding the age of the petitioner at the time of the testimony. At the time of the testimony, she was 72 years old. Also, between the events in question happened in 1992. The main part of the events happened in 1992. The testimony was given in 1998. A significant amount of time had passed, and that alone gives rise to some possible inconsistencies in terms of the recollection of the petitioner herself because of her advanced age and also from the petitioner's son just by the length of time. And I believe the petitioner's son even mentioned that during his testimony. Regarding some testimony, it was obvious from the record that the Respondent wanted to talk. I mean, if you read the records, she wanted to keep talking, and at different times she was cut off at the very end of her testimony. She asked whether she could talk about something else, and the judge indicated that she should only answer the questions posed to her. Possible that regarding some of the events, including the beating, that the reason she did not mention that was she was not specifically about that event and that she did not get an opportunity to present that testimony. She did provide it in the declaration before the hearing, so it is part of the record. Also, regarding the lack of corroborating documents, she and her son testified that they had attempted to obtain those documents. However, their attempts to get them were rebuffed by the people they contacted. I believe the petitioner testified that she had tried to contact the member of the print shop, print office, and he had told her that he could not give her those documents. So in that regard, she did attempt to get corroborating documents, and, however, she was not able to get them. If there are any other questions, I will submit. I think not. Thank you. Thank you. The matter just argued to be submitted.
judges: B. Fletcher, Rymer, Fisher